# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. AMBRECO SHAW

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-05450     James C. Beasley, Jr., Judge**

---

**No. W2003-02822-CCA-R3-CD - Filed September 28, 2004**

---

The defendant, Ambreco Shaw, was convicted by a Shelby County Criminal Court jury of second degree murder, a Class A felony, for shooting a man to death at a Memphis public housing development. The trial court sentenced him as a standard, violent offender to twenty-four years in the Department of Correction, applying four enhancement factors to increase his sentence from the presumptive twenty-year midpoint in the range. In a timely filed appeal to this court, the defendant raised as his sole issue whether the evidence was sufficient to sustain his conviction. However, following the United States Supreme Court's opinion in Blakely v. Washington, 542 U.S. ___ , 124 S. Ct. 2531 (2004), which was released during the pendency of this appeal, the defendant sought and received permission from this court to raise as an additional issue the impact of the Blakely decision on the sentencing imposed in his case. Based on our review of the record, the parties' briefs, and applicable law, we conclude that the evidence was sufficient to sustain the defendant's conviction and that two of the four enhancement factors were appropriately applied under Blakely. We further conclude that the applicable factors justify the enhanced sentence in the case. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; W. Mark Ward, Assistant Public Defender (on appeal); and Trent Hall, Assistant Public Defender (at trial), for the appellant, Ambreco Shaw.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Nicole Duffin, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On October 10, 2001, the defendant shot and killed the twenty-eight-year-old victim, Michael Carter, following an argument that occurred on the balcony outside the victim's girlfriend's apartment. The defendant fled after the shooting and remained in hiding for several months, but was eventually captured and brought to trial on a second degree murder charge.

## Trial

The victim's mother, Mary Carter, testified that the victim left her home on the morning of October 10, 2001, to go to an apartment in the Dixie Homes, a Memphis public housing development where his girlfriend lived with their five-year-old son. She stated that she received word later that day that the victim had been shot and was at the hospital. Upon her arrival at the Regional Medical Center, the hospital chaplain informed her that the victim was dead.

The victim's fiancée, Kenia White, testified she and the victim were returning to her second story apartment after dropping their son off at school when they encountered the defendant, whom she knew as "B," lounging beside the balcony in front of "Renee's" apartment, located a few doors down from her home. The victim spoke to the defendant, telling him he would see him that afternoon, and she and the victim retired to her apartment to sleep. At about 2 p.m., the victim's friend, Brian, and a man she did not know stopped by her apartment. The men asked the victim if he knew where they could get some drugs, and he replied that he did not but would check with some men at Renee's apartment. Ten or fifteen minutes after the victim returned from Renee's apartment, the defendant came to White's end of the porch and "in broad daylight showed Brian the dope in his hand."

The victim chastised the defendant, telling him that he could have asked to step inside the doorway rather than conducting his transaction in front of their apartment door. White explained that her apartment building, which was commonly known as "the dope track," was constantly patrolled by the police. Although she could not hear the defendant's response, it caused the defendant and the victim to "hav[e] words with each other" and to exchange curses. She calmed the men down, and the victim told the defendant to keep the drugs on his end of the porch. The defendant left, and the victim resumed drinking his beer and talking and laughing with his friends.

White estimated it was ten to fifteen minutes later when the frowning defendant, whose t-shirt was "cocked up in the air" as if he had "stuck something in [his] pants and . . . forgot to put [his] t-shirt down," met her and her son as they were headed down the stairs to the store. Thinking nothing of it at the time, she continued past him and down the stairs. However, when she heard the victim curse again in response to something the defendant said, she stopped at the bottom of the stairs and called up to the defendant, "Dog, boy, you that mad because he told you we don't want you in front of our door? We don't care how many drugs you sell. Just keep it away from in front of our

door." The defendant cursed her in reply, and the victim told her to stop arguing with him and to continue on her way.

Hearing no further argument between the men, White walked to her car, which was parked in front of the stairs to her apartment building. At about the time she inserted her key in the car door, she heard gunshots, looked up, and saw the defendant with his arm extended shooting at the victim. The victim fell backwards in an attempt to flee, while the defendant, who was "skipping backwards" toward the stairs, continued firing his gun. White testified she heard multiple gunshots and saw the defendant's arm extended, but was unable to see the defendant's gun because of the balcony guardrail. She said the victim was also hidden from her view after his fall. However, based on seeing her apartment door open and then shut, she assumed he ran in a crouching "duck walk" into her apartment to escape the defendant.

White testified she ran with her son to the apartment building and started up the steps, only to encounter the defendant, gun in hand, on his way down. The defendant stopped two to three feet from her and pointed his pistol directly at her face. She grabbed her son, fell to the ground, and "covered up." Next, she heard a "click," which she interpreted as the defendant's attempt to shoot her with his pistol, which was out of bullets. When she sat up, she saw the defendant running toward the corner of the apartment building where he disappeared from view.

When White reached her apartment, the victim unlocked and opened the door from the inside and instructed her to call 9-1-1, telling her he had been shot in the leg. Although she saw no blood and he initially appeared to be all right, he soon broke out in a sweat, sat down, and began foaming at the mouth. A police officer arrived as she was on the telephone with the 9-1-1 dispatcher, and remained with the victim while she took a second police officer to the defendant's mother's residence a few streets away. By the time she returned to the apartment, the paramedics had already taken the victim to the hospital.

White testified she went from her apartment to the police station, where she gave a statement and identified the defendant from a photographic lineup, and then to the hospital, where she learned that the victim was dead. She made a positive courtroom identification of the defendant and testified she was certain the victim was holding a beer in his hand at the time of the shooting. However, she acknowledged on cross-examination that she did not know what had transpired between the men immediately before the shooting.

Sergeant Marlon Tabor of the Memphis Police Department testified he was assigned to the Memphis Public Housing Bureau in October 2001, and was patrolling in the Dixie Homes development on October 10 when he heard what sounded like gunshots and someone told him a shooting was taking place around the corner. There, he saw a group of people standing in front of an apartment building pointing up to a second story apartment. He went up the stairs, where he was met by Kenia White, who informed him her boyfriend had been shot. The victim, who was lying on his back in a hallway inside the apartment, had "small trickles of blood coming out of him," was laboring to breathe, and appeared to Sergeant Tabor to be "in [a] pretty serious condition."

-3-

Nonetheless, he was able to reveal the identity of his assailant and to indicate what led to the shooting:

> I asked him several times who shot him and he finally said someone named B. And he told me kind of what happened to him. He said that him and B or someone got into an argument and he was shot. It was something dealing with drugs. He was kind of saying it in a lot of broken English. I had to get down really to hear what he was saying.

Sergeant Tabor testified White informed him that "B" lived around the corner and took him to the defendant's mother's apartment, located about a block away in the same housing development. The defendant was not there, and he was unable to locate him at that address despite returning to the apartment "on multiple occasions" over "multiple days." On cross-examination, Sergeant Tabor testified that the Dixie Homes development was a high crime area "[a]t one time," but that "the crime rate [was] fairly low i[n] that area now."

Memphis Police Officer Katie Ward, who was assigned to the Dixie Homes area in October 2001 and was one of the officers who responded to the shooting, testified the victim was lying in the hallway of the apartment when she arrived, was sweating, and was not moving. The victim told her and other officers that "B" shot him. A young woman informed them where "B" lived, and she and several fellow officers went to that location but were unable to find him. On cross-examination, Officer Ward readily acknowledged that the Dixie Homes development was a "high crime area."

Memphis Police Officer Mike Schafer testified he and fellow officers went to the Oak Manor Apartments on March 3, 2002, in response to a Crime Stoppers tip that the defendant was outside one of the apartment buildings. The defendant fled at sight of the officers, but was captured after running approximately fifty yards.

Dr. Theresa Allen Campbell, the Shelby County medical examiner who performed the autopsy of the victim's body, testified the victim's cause of death was multiple gunshot wounds, consisting of a fatal gunshot wound to the left lower abdomen in which the bullet perforated the left common iliac artery and the left common iliac vein, causing the victim to bleed to death, and a gunshot wound to the right thigh in which the bullet lodged in the muscle but did not hit any vital structures. The victim's drug test was negative. His blood alcohol level was .02, which was consistent with his having consumed a beer at or near his time of death. In addition to the gunshot wounds, the victim had abrasions on his left hand, an abrasion on his forearm, and red linear contusions on his chest. Dr. Campbell agreed the abrasions to the hand and arm were consistent with the victim's having fallen on concrete, and testified that the patterned linear contusions on his chest were more consistent with medical intervention than with a punch. On cross-examination, Dr. Campbell testified that the victim was five feet, ten inches tall.

Following the trial court's denial of his motion for judgment of acquittal, the nineteen-year-old defendant took the stand in his own defense. He began his testimony by admitting he shot the victim, supported himself until the time of his March 3, 2002, arrest by selling crack cocaine, and had prior convictions for theft of property under $500, theft of property over $500, and theft of property over $1000. He claimed, however, that the shooting occurred during a physical altercation in which the victim made a move as if to reach for a weapon. According to the defendant's account, he was leaning against the balcony rail talking to Renee when the victim's friend Brian and Brian's associate approached the victim outside White's apartment. The victim called to him, and he walked down to the victim with the intention of telling the victim's friends where they could find some drugs. The defendant testified he had no drugs with him at that time, but if he had, he would have sold them to the victim's friends.

The defendant testified a verbal confrontation ensued between him and the victim, which was immediately followed by the victim's punching him in the chest. The defendant stated he was 5'6" or 5'7" and stumbled backwards after the victim punched him. As he did so, he saw the victim reach down toward his pants pocket. Believing the victim was going for a gun, he pulled the .22 revolver he constantly carried for self-protection out of his rear pocket, fired two or three shots at the victim, and then fled. The defendant insisted he had no intention of killing the victim. He said he fired downwards and thought he had shot the victim in the leg.

The defendant testified he dropped his gun on the apartment stairs as he fled. He said he ran to a nearby wooded area, where he hid for approximately an hour and a half until "the commotion had died down." Afterwards, he went first to a girlfriend's house, and then stayed in a series of motels, where he supported himself by selling drugs, until he was ultimately captured. He explained his failure to turn himself in by stating that he was afraid of what would happen to him and his March 3, 2002, flight from the police by stating he overreacted out of fear that the officers would shoot him. He said he was "very sorry" about what had happened, "never intended for things to get that far," and would never again carry a gun.

On cross-examination, the defendant testified the victim initiated the argument and physical altercation. He claimed not to have known what the fight was about and to have merely reacted to what he had perceived as a threat. He admitted he never saw the victim with a gun. He denied he pointed his gun at White or her son, testifying he no longer had his weapon at the point he passed them on the stairs. He acknowledged he hid from the police from the time of the shooting until his capture, but also claimed he had tried to turn himself in. According to his testimony, he telephoned the "homicide squad" in January 2002, spoke to someone to whom he provided his name, the name of the victim, and the date of the shooting, and was told by that person that he was not wanted for anything.

### Sentencing Hearing

At the October 17, 2003, sentencing hearing, the victim's older sister, thirty-two-year-old Shantel Carter, testified that her twelve-year-old sister and seventeen-year-old brother were both

devastated by the victim's death and that her mother cried "on a regular basis." She said she had been left with the responsibility of raising the victim's eleven children, as well as her own four, and requested that the defendant receive the maximum sentence. The defendant stated he was "truly sorry" for what happened and would have walked away if he had "used [his] mind at the time," but the "misunderstanding got truly out of hand."

The trial court found the following four enhancement factors applicable to the case: (2) the defendant's previous history of criminal convictions or behavior, based on his prior convictions and evidence he made his living by selling drugs; (9) the defendant's previous history of unwillingness to comply with the conditions of a sentence involving release into the community, based on a January 2001 violation of probation reflected in his presentence report; (10) the defendant's use of a firearm in the commission of the offense; and (11) the defendant's lack of hesitation in committing the offense when the risk to human life was high, based on evidence that the shooting occurred at an apartment complex where other individuals besides the victim were present. See Tenn. Code Ann. § 40-35-114(2), (9), (10), (11) (2003).

The trial court weighed the first and third of these four enhancement factors most heavily, placing very little weight on the defendant's violation of probation or lack of hesitation in committing the crime when the risk to human life was high:

> The Court is going to put a great deal of emphasis on [the defendant's] criminal activity, his criminal convictions, his criminal behavior. The Court is also going to put a great deal of emphasis on the fact that [the defendant] used a pistol in the commission of this offense. We have a combination of somebody selling drugs, somebody that is in the process of selling drugs, who has a firearm in their possession, and then when an incident occurs, an argument in this case is strictly what this amounted to. The victim in the case told [the defendant] to sell his drugs on the other end of the walkway. That's what it amounted to.

> And [the defendant] and he got into a disagreement over I assume where the drugs were going to be sold. But the testimony was that they were arguing about the fact that [the defendant] applied his trade in front of the victim's residence after being asked not to do so. And as a result, words escalated into [the defendant] producing a pistol and firing it and killing the victim in the case.

> So the Court is going to put a great deal of emphasis on his prior history, his selling of drugs, his involvement in criminal convictions, and the fact that he armed himself with a firearm and used that firearm in the commission of the offense.

The Court will put a small bit of emphasis on the fact that he has previously violated a misdemeanor probation. But I think it's something that the Court can consider and will put some emphasis on it. But the Court's great deal of emphasis is on his history, prior history, and the use of a firearm.

Finding no applicable mitigating factors, the trial court sentenced the defendant as a Range I, violent offender to twenty-four years in the Department of Correction. The trial court subsequently overruled the defendant's motion for a new trial, and this appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence at trial shows that he acted under the heat of passion produced by adequate provocation and, thus, is guilty of voluntary manslaughter rather than second degree murder. The State argues that the evidence supports the jury's verdict. We agree with the State.

When the sufficiency of the conviction evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a

defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2003).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Id. § 39-11-106(a)(20). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a). "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

To support a second degree murder conviction, the State had only to establish that the killing of the victim was knowing beyond a reasonable doubt. See State v. Summerall, 926 S.W.2d 272 (Tenn. Crim. App. 1995). Viewed in the light most favorable to the State, the evidence here showed that the initial confrontation between the defendant and victim had ended and the defendant had left the scene when he returned some ten to fifteen minutes later armed with a pistol, engaged in a second, brief, verbal exchange with the victim, and then pulled his pistol and shot the victim in the abdomen and leg, causing his death. These actions were sufficient to support the jury's finding that the defendant committed a knowing killing of the victim.

As support for his argument that the evidence shows voluntary manslaughter rather than second degree murder, the defendant cites his testimony that the shooting occurred in the midst of a physical altercation initiated by the victim after the victim made what he interpreted as a move for a gun, as well as White's admission that she did not witness what transpired immediately before the shooting. However, although the defendant described a single confrontation between himself and the victim, White described two separate encounters, the second of which was initiated by the defendant, who upon his return wore his t-shirt "cocked up" as if he had stuck something in his pants. Moreover, although White acknowledged she did not see what transpired immediately before the shooting, she testified that she heard no further argument between the men as she walked toward her car and that the victim was holding a beer in his hand when shot. Having heard the conflicting testimony, and having been instructed on the elements of second degree murder and voluntary manslaughter, the jury convicted the defendant of second degree murder. In so doing, it obviously rejected his contention that he acted in a state of passion produced by adequate provocation. This

was its prerogative. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for second degree murder.

## II. Impact of <u>Blakely</u> Opinion on Defendant's Sentencing

The defendant contends that the sentencing imposed in his case should be reevaluated in light of the recent <u>Blakely</u> opinion. <u>Blakely v. Washington</u>, 542 U.S. ___ , 124 S. Ct. 2531 (2004). The State argues, *inter alia*, that the defendant has waived the issue for failure to raise it in a timely fashion; all four enhancement factors are applicable under <u>Blakely</u> because the defendant either admitted or failed to contest the facts on which they were based; and finally, even if enhancement factor (11) was inappropriately applied, the remaining enhancement factors, clearly appropriate under <u>Blakey</u>, justify the enhanced sentence imposed.

Tennessee Code Annotated section 40-35-401 provides that our review of the length or manner of service of a sentence should be conducted *de novo* on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). <u>Blakely</u>, however, calls into question the validity of the trial court's finding of certain enhancement factors to increase a defendant's sentence from the presumptive sentence in the range. In that case, the United States Supreme Court applied the rule in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt") to conclude that a criminal defendant's Sixth Amendment right to trial by jury encompasses the right to have the jury, rather than the judge, determine the existence of any sentence enhancements other than those based on facts reflected in the jury verdict or admitted by the defendant. <u>Blakely</u>, 124 S. Ct. at 2536-38.

The State first argues that the defendant waived the sentencing issue by failing to raise it in his original brief. The State further argues that the issue cannot be addressed as plain error because no clear and unequivocal rule of law was violated by the trial court's application of the enhancement factors and the defendant failed to establish that he waived the issue for anything other than tactical reasons. We respectfully disagree.

Tennessee Rule of Criminal Procedure 52(b) defines "plain error" as "error which has affected the substantial rights of an accused" and which "may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Since the intention of the rule is to serve the ends of justice, it is invoked only in exceptional circumstances where necessary to avoid a miscarriage of justice. <u>State v. Adkisson</u>, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994) (citing <u>United States v. Gerald</u>, 624 F.2d 1291, 1299 (5th Cir. 1980)). The following factors should be considered by an appellate court when determining whether "plain error" has occurred:

a) the record must clearly establish what occurred in the trial court;

b) a clear and unequivocal rule of law must have been breached;

c) a substantial right of the accused must have been adversely affected;

d) the accused did not waive the issue for tactical reasons; and

e) consideration of the error is "necessary to do substantial justice."

Id. at 641-42 (footnotes omitted).

The State quotes the Blakely Court's observation that the "State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding," 124 S. Ct. at 2541, to argue that no "clear and unequivocal rule of law" was violated by the sentencing procedure employed in this case. The State further asserts that "[i]t is entirely possible that the defendant waived the issue because he preferred judicial sentencing. The defendant could have raised the issue under Apprendi prior to the cases being docketed and did not." However, when the portion of the Blakely opinion on which the State relies for this argument is read in context, it is clear that the defendant's failure to contest the enhancement factors was not the type of "consent" to judicial factfinding that the Court envisioned:

> Justice BREYER argues that Apprendi works to the detriment of criminal defendants who plead guilty by depriving them of the opportunity to argue sentencing factors to a judge. But nothing prevents a defendant from waiving his Apprendi rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding. If appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty. Even a defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial. We do not understand how Apprendi can possibly work to the detriment of those who are free, if they think its costs outweigh its benefits, to render it inapplicable.

Id. (citations omitted). Prior to the release of the Blakely opinion, criminal defendants in Tennessee routinely accepted the trial court's, rather than the jury's, finding of enhancement factors, despite the rule announced in Apprendi. Thus, we cannot consider that the defendant meaningfully waived his Sixth Amendment right to have the jury determine the existence of the enhancement factors in his case.

Under <u>Blakely</u>, the only enhancement factors other than prior convictions that a trial court may apply to increase a sentence are those which are reflected in the jury verdict or admitted by the defendant. <u>Id.</u> at 2537. Therefore, the trial court's application of enhancement factors (2) and (10) was appropriate, as the defendant freely admitted in his testimony that he had prior convictions for theft, supported himself until the time of his arrest in the instant offense by selling drugs, and used a pistol in the commission of the offense. However, since the facts underlying enhancement factors (9) and (11) were neither reflected in the verdict nor admitted by the defendant, we conclude that the trial court erred in applying these factors to the offense. <u>See</u> <u>id.</u> at 2542 ("Any evaluation of <u>Apprendi</u>'s "fairness" to criminal defendants must compare it with the regime it replaced, in which a defendant . . . would routinely see his maximum potential sentence balloon . . . based not on facts proved to his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong.").

In sum, we conclude that enhancement factors (2) and (10) were appropriately applied under <u>Blakely</u>, but that the trial court erred in applying enhancement factors (9) and (11). We further conclude that the strong weight to which the trial court assigned the applicable enhancement factors more than justifies the enhanced sentence imposed. Accordingly, we affirm the twenty-four-year sentence.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE